The next case called Foral Argument is in Re the Marriage of Dressel. I'm here for Deborah Dressel. This is an important case to her in that she had a settlement agreement that she bargained for, drastically modified, changed, and terminated by the action of trial court. Over the weekend I tried to think of how am I going to persuade this court. I basically came down to, I think, five different terms. Structured settlement, structured agreement, deference reliance, excision, de novo, and post-separation income. I intend today to try to draw those points all together for the benefit of the court. This was a structured agreement. This was not an agreement that simply said pay X number of dollars in maintenance. Instead what this was, was a well-crafted agreement structured in such a manner that it was going to peel back the responsibility for maintenance over a period of time. By reading the agreement as reached, the court will see that she did not get more than 50% of the property. Instead she sought security, the security of the maintenance for which she bargained. There was an extra $1,000 per month that was provided to her for the first 12 months. After that first 12 months, that $1,000 per month was peeled back. There was a provision for three years that 100% of her health care expenses were going to be paid. And it was peeled back to 50%, but no more than $300 per month. Those changes took place. And there was a final change that was going to take place, and will take place ultimately, and that is that the amount of contribution towards the health care expenses ultimately is peeled back as well. So we do not have a situation in which we have a simple dollar amount and said this runs forever and this doesn't happen. We have two component parts to the maintenance. Those two component parts to the maintenance, one are a monthly amount and secondly is an annual amount as to those payments. Both of those payments were permanent maintenance, and I'll get to that in a second with reference to the discussion of excision later on. That's the agreement that was bargained for. For this Court to put this case in the proper perspective, the Court, I would ask the Court to look at what took place at the time of the original hearing and what took place at the time of the second hearing. This was a 28-year marriage. My client, Deborah Dressler, had a son for which she cared for. She had employment during the marriage. She had employment as a clipboard operator for the phone company, an antiquated job. She was offered a new job, but the new job was going to require that she move within a five-state area, and the family agreed, the husband agreed, and there's no dispute to this, that she should not take that job because she was needed at home. Did she have any education beyond high school? Very little. I think it was more vocational than anything. I mean, on the job. There was not an advanced degree? There was no associate degree. I doubt that there was anything past high school, but I want to be fair with the Court. I can't say definitively. I just don't recall anything in the record that has any educational background for that. In addition to the fact that she had that lack of skills, she then went back to work for a school district. Her husband became ill. She gave up that job in deference to her husband, came home, nursed her husband back to health, then took a job in a school district in which she described herself as having to get a job in which she had to work with behavioral disorder children, and as a result of that, she had a very difficult time in school. She was spat upon. There were fights that broke out. Her husband told her she didn't need to do that and it was more beneficial for her to be at home with her teenage son than for her to be employed. So that's what she came into this settlement agreement with. She then bargained for the settlement agreement, which she did get more than half of the property, and she got a structured settlement which gave her rights and continued rights. We also then have the fact that in 2005, after that first judgment of dissolution of marriage, she relied upon what she gained in that agreement. She relied upon that for what she was going to do. She made some decisions which you and I may challenge, and the trial court did challenge. The trial court accepted the proposed finding of fact by the counsel for the defendant in this case, in which she said it was unreasonable for her to look for the job that she did, for her to take that training. This was a job she felt she could do. This was a job she felt comfortable in doing. It's a job in which she felt she could make some income from it. Ironically, she doesn't come back to court because of the fact she didn't make a goal of it with this business, which she anticipated to be earning at least $7,500 a year by the time she goes back to court. The other side comes back to court because of a change in their economic circumstances, and then seeks to have that modified. That's the first point, Your Honor. The first two points, structured agreement and reliance. The next point's kind of an interesting one, and that's the point of excision. What do I mean by excision? Well, I'll hold it up to you, Your Honor. On page 3 of the judgment-dissolution marriage, and in the appendix on page 12, you will find the judgment-dissolution marriage. I went through over the weekend and crossed out those portions of the agreement that are not required in order to give the interpretation that is being requested by counsel for the defendant in this case. You can cross out, as a matter of fact, you can cross out 63 of the 152 words and get their interpretation and take out all the things which we think are the substance of the agreement, what we think was bargained for, what we think was the reason why this agreement should stand on its own merits, in which you neither add nor detract from the agreement that was reached. Counsel makes the argument in the brief that termination is the only thing that's limited. But what, in fact, did the agreement do? But the agreement provided its own mechanism for modification. It built into its own mechanism for modification what was there. In addition, and that's that 63 out of 152 words are only subparagraph D of the judgment concerning what goes on with maintenance. I'd also note that there is an additional provision that comes later on at the end of the agreement where it says, where the judge's order is saying, wherefore you bind, it says, and each and every provision thereof is binding upon the parties. It doesn't say some parts are binding, some parts aren't binding. It doesn't say something else should happen. It also doesn't say anywhere in the provision concerning maintenance until further court of court, until a modification. It also has on page 7 of the judgment, as provided in the marital settlement agreement here above provided, she shall receive maintenance as provided in that agreement. What's happened in this case is we're now taking away the very maintenance she bargained for and, in essence, allowing the husband's situation to come before the court and say, I have had some reversals with reference to my time, and as a result of that, I want the court to modify something that was not part of the provisions that were bargained for. You don't disagree that the modification is allowed even though the word permanent maintenance is used, right? This maintenance could be modified based on a change in circumstances. Your Honor, I have to – can I break the question out for a minute? Sure. The word permanent, Your Honor, has not been interpreted in such a fashion in and of itself to say that that prevents modification of an agreement. That alone doesn't do it. I would caution the court that when the term permanent maintenance is used in the modification realm, what generally happens is it's a trial court making the determination that it's permanent maintenance versus rehabilitative maintenance. However, when you have the entire structure of the agreement and the manner in which this agreement was structured, then there is a limitation under paragraph 502F, which allows the parties to structure their own terms by which to have the agreement reached. And that – those – their own terms can give rise to saying that there's a limitation with reference to modification. And we believe when the court looks at the number of things that have to come out of the agreement in order for that to happen, I think it does take itself to the point where it is an agreement that is not subject to modification. So essentially you're saying that a contract can trump the statute that does allow for modification when there is a substantial change in circumstance. Your Honor, I would suggest that I'm not trumping the statute. I'm saying section 502F trumps section 510. Can you point to me where in 502F it essentially says that? In 502F it allows the parties to structure an agreement as they see fit with the one limitation with reference to child custody and child support. I think maybe that's two limitations. It says you can't structure those with reference – you can't modify those. But with reference to maintenance, there is no limitation on what you can do with reference to structuring your own agreement. So let's say if there had been more of a change in circumstances in this case where all of a sudden he's making $10,000 a year and didn't have the assets to draw from, where would we be then? Your Honor, where would we be then? The same way in which agreements are repeatedly in which people reach a bargain. You mean reach a contract. It's that correct. We've got contract arrangement, and the contract arrangement is something that is favorable to one side when it starts out. In this case, it was favorable to Mr. Dressel when it started out. But then he would be in violation of the court-ordered contract here. What are we going to do with him? Throw him in jail? I mean, if he really doesn't have the resources. I'm being extreme. I understand that. And in the extreme situation the court would describe, we have an issue concerning contempt. And the defense to contempt is the inability to comply with an order that's out there and outstanding with reference to that. Again, the court is saying that's a situation that doesn't exist here, but I understand the hypothetical that may occur with reference to that. In this case, we have an entirely different situation in which we have the ability of this gentleman to make the payments that were there. And if I may continue with the argument, with reference to the NOVA, this court has in front of it a contract which this court has the right to look at first the blush and make its own determination and interpretation of within the four corners of the document. And it also has a statute, which it has in front of it, in order to make the same determination. What I'd also make note of is the fact that we have the post-judgment income. Again, over the weekend I looked at it. $1,685,000 is the amount of money Mr. Dressel made in the three years following the entry of this judgment of dissolution of marriage. That's found on page 18 of the brief that we provided the court. That's an amount of money to pay for the maintenance for my client for the rest of her life. He did that within the three years afterwards. That amount during those three years was $777,832 more. In those three years than he had made the three years before we reached the agreement in this case. So we have a gentleman who comes to court. And this gets beyond the argument as far as the right to keep the agreement as it originally was standing. And the fact that that was there and then he jumps into court and wants a modification filed in November of a year in which he's making over $400,000 in income. That's a travesty. That's an injustice to my client to say that he has the right to come before this court, the trial court, and ask for a change. And jump in that change and say, I should get it immediately. He doesn't come before the court and say, oh, Judge, I made more money this past year. I've made, for one year, $800,000 in one year. I have made that $800,000. She should get a little more. Don't you think she should get that? No. He didn't have the obligation to do that. The contract doesn't obligate him to do that. What the contract obligated him to do was pay the amount that was there. And you say, well, what's the significance of that? Well, I wrote down some other numbers. And these are in the brief, too, on pages 22 and 23. 20.88%. That's the amount of the husband's average income during the three years before the divorce that was awarded to her, actually not awarded to her, bargained for her as far as her maintenance in this case. The next number there, 10.93%. That's the amount of money that he paid of the income that he earned during those three years post-judgment. So we bargained for 20%, 20.88%. We end up getting 10.93%. But the worst part of it is this. After all this is said and done and after the modification takes place, she ends up with 9.32% of his income as the amount of support that she's provided for and that she's asked to live upon. That in and of itself is an injustice. But in this case, it even gets worse. And how does it get worse? It gets worse because of the fact that, as we just found out with the president, the president has a health care plan. The health care plan has everybody up in arms. And with justification, regardless of how you believe the president's plan, it's a difficult thing. Deborah pays $620 a month for health care. Her husband, who's employed, pays $47.95 per month in health care. Now, it's true that $300 of her $800 in maintenance is now attributed to health care. She still has to pay the other $320 or so. I thank you for your time and attention. Thank you, counsel. Counsel? Good afternoon. May it please the court? There's one question, and that is whether the trial court used its discretion when it modified Douglas' maintenance and denied Deborah's petition for rule to show cause. The standard of review here is not de novo. It is the abuse of discretion. It is a question of fact. There is not a contract here for the court to review. It is not an issue of contract interpretation. Once a settlement agreement is incorporated into a judgment, it loses its contractual nature, and the court's power to modify an award of maintenance is then controlled by the statute. Counsel is absolutely correct. The parties are allowed to limit modification in a settlement agreement, which is then incorporated into the judgment. If that is the case, that is what controls the court. That is not the case here. There were no limits as to how the parties could modify maintenance. And when there are no limitations on how maintenance can be modified, the court retains the authority to modify maintenance, and the court must determine whether or not there's been a substantial change in circumstances. What kind of language would have kept the court's hands off of it? Specifically, I believe it was in Ray Martino, but I'm not exactly correct. I know that I cited it in the brief. When there is language limiting modification, it is very specific, such as, you know, this award can only be limited in the event the party obtains employment or if the party's employment is part-time or only reaches 10 hours. I think it was the exact language in the one case that was cited in the brief. But usually when the modification power is limited, the language is specific. There was absolutely no language within this settlement agreement that limited the court's power to modify. And, therefore, it was then controlled by the statute, which the court had to determine whether there was a substantial change in circumstances. There was. Douglas' income was decreased by 75%. That reduction in income both parties agreed was fortuitous and constituted a substantial change in circumstances. At that point, the court would consider the applicable factors that are set forth in both 510 and 504. When considering these factors, the court does not need to make specific findings. The court had before it, as counsel indicated, the 2005 judgment of dissolution of marriage, which was essentially an assessment of the pre-dissolution factors relevant to determining the initial maintenance decision. The trial court also heard and considered testimony, counsel arguments, and exhibits, which included pre- and post-dissolution tax returns, Douglas' asset and liability affidavit, and post-dissolution financial statements. Yes, Douglas' income during the 2006 to 2008 post-dissolution income was approximately $393 on average per year. Deborah's average income per year was $129,000. And Deborah's assets included $850,000. Sorry, Deborah's assets were $850,000. Douglas' assets were a million. Yes, the assets were there to continue paying, as counsel indicated, that he could have depleted his assets in order to pay for maintenance. But the same argument could be made, why should he be depleting his assets that were awarded to him under the marital settlement agreement? But she's not required to deplete her own assets. Deborah also had a house with no mortgage payment. She had no vehicle payment, and she was receiving assistance with health insurance. Deborah was employed. It was not profitable employment, as the testimony indicated and as the order stated. She was, in fact, losing $160 a month being a nail technician. The trial court found that this employment was unreasonable and that it was not a reasonable attempt towards self-sufficiency. Douglas is not required to support Deborah's unreasonable employment choice, but she's capable of earning more income. I have a question about that. What was it shown, I guess, in the original trial that she was capable of doing? I believe her Social Security printout had shown, which was produced, I believe, as an exhibit, had shown that her highest earned income during the marriage was $34,000 a year. And I believe that that was during the time that she was a teacher's aide, wherein she did testify that she was not happy working with the behaviorally challenged students. However, alternate employment may not be her passion, but she is obligated to seek and accept appropriate employment, as the trial court did indicate. In addition, if Douglas' maintenance obligation was not modified, that maintenance would be 55% of Douglas' income from his employment. Once you include the health insurance that he's required to pay, that would have been 59% of Douglas' income from his employment. The trial court found that there was a substantial change in circumstances and considered all the applicable factors that are required in 510 and 504 and properly modified the maintenance obligation, and that decision was not in abuse of discretion. Finally, the trial court properly denied Deborah's petition for rule to show cause. There is one maintenance award. Counsel even stated that there are component parts to the maintenance. There's a monthly and annual maintenance payment. They were not exclusive of one another, but one award with three subparts. A termination of one subpart is a modification of the whole. A termination of all three subparts would qualify as a maintenance termination and could only be accomplished by mandatory and terminating events that are cited in the Illinois Marriage and Dissolution of Marriage Act. Deborah also classified in her testimony that the maintenance obligation is one exclusive award. The intent of the parties was for the $40,000 of the yearly maintenance payment to be paid using Douglas' bonus. The party's testimony, trial, and the trial court's order reflect that intent. Does the word bonus appear in that $40,000 amount? It does not, but testimony by the parties as well as the trial court's order indicated that the intent of the parties was for that $40,000 maintenance payment to be paid using Douglas' bonus. In 2009, his bonus payment was $5,000 and therefore did not have the sums from the bonus to pay the $40,000. What was his income during that same time? I believe it was $98,000 because his income dropped from approximately $398,400 to $98,000, which was the 75% decrease in the... In 2008? Correct. In addition, Douglas' petition to modify the maintenance predates the due date of that bonus, and Deborah alleges in addition that $40,000 yearly maintenance payment should be prorated. That prorate only applies when the maintenance obligation is terminated. The maintenance obligation was not terminated. It was modified, and therefore that provision is irrelevant. Again, the court had the authority to modify the payment and the modification of the maintenance as well as the denial of Deborah's petition for the rule to show clause were not in abusive discretion. Thank you, Your Honor. Thank you, counsel. Counsel? I am concerned about... I mean, obviously she'd be better off sitting at Starbucks drinking coffee all day than losing money as a nail tap. So I'm real curious as to what court... what findings the court made with respect to her ability to earn any kind of income that would help sustain her. The court encouraged her, I think, by its findings. I think maybe wrongfully in the sense of penalizing her for her actions that had taken place and saying we're going to make the modification. But I think that what had happened really was the fact that it found that it was unreasonable for her to do that. She indicated that she was trying to start networking, and she was hopeful that over the course of time that she would build up some clientele with reference to this.  In 2008, the income was $401,000 of Mr. Dressel during that period of time. I'd also make note, counsel makes the argument here that, one, you cannot terminate maintenance, but you can modify the maintenance now. To what point, we don't know, but it can be modified, but it can't be terminated. Let's listen to the argument you've heard. You'll see in the brief, and you'll see in the trial court, the argument made is you can't do anything to the health care. Health care is self-contained. You can't modify it. You can't change it. You'll find that in the trial court as far as what's there. What have you heard today? You can't terminate maintenance, but you can modify it down to apparently some, you know, infinitesimal level that is down there that you can get to. That's inconsistent with the very terms of the agreement which structured how this was going to work out. I'd also note that during the period of time in which Mr. Dressel knew that his circumstances changed, he took a trip to Ireland. He got married before he knew his circumstances changed, but he took on those responsibilities and knew things. His assets increased by $170,000. Counsel's made the argument here, okay, he may have to pay 50 to 60 percent of his income. Well, he also was able to use that $777,000 he earned more during the years post-dissolution marriage years in order to use it to subsidize and grow his assets, despite having his lifestyle in which he chose to do the things he did. Well, if the trial court was correct when his income went down to $98,000 to reduce the maintenance, what prevents it from increasing it when his income goes up? If the court takes the interpretation of this thing is such that it can be reduced and can be modified, I would suggest to the court that that isn't the reason for how it should happen. By reason of the fact it says permanent, as more specifically provided in herein, there was a pro rata provision with reference to $40,000. In the contract? In the contract. It says pro rata. If it's terminated, Your Honor, and terminated on one of the mandatory events, it's back in 510. 510C is referenced in the document. There's no 510A and there's no 504 that's in the agreement. It specifically references the mandatory provisions in 510C. It doesn't go into the other provisions. It doesn't go into the language that was there to say this would happen. And it has the pro rata provision with reference to the $40,000. That's specifically in there. It says defendants shall pay plaintiff the pro rata portion of the annual settlement from March 31 to the year until the date of termination. There's a date of termination. You can have that. That would make the responsibility to pay for the previous year. We have a previous year in which we made $400,000 and the court terminates it the following year in its entirety. It suggests to the court that, one, there isn't a right by reason of the contractual language to modify it. And if there is a right to modify it, Justice Wexton, it was improper to modify it now. This court, if it's going to take the position this is modifiable, should use its judgment in interpreting the statute and looking at the statute that now provides it to consider post-judgment income and use that post-judgment income to say you can't take this $777,000 and say you want to jump right ahead and reduce it. That's unjust. The court is one that should look at what the overall complexion of this thing is. The gentleman who's been able to raise his assets by $170,000 has a job that is, you know, infinitesimally more than my client's income by what's there. Those circumstances don't justify the modification at that time. So even if you reach the fact that there was a right to modify, I suggest to the trial court that if you're going to get to that part, what you ought to do is you say that right to modification can only take place once you have used up some of the surplus income that you've been allowed to accumulate and assets you've been allowed to accumulate since the time of the judgment. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We leave the case under advisement. We're recessed.